**TEAL & MONTGOMERY**
STEVEN O. TEAL   (Bar No. 58454)
MICHAEL S. HENDERSON   (Bar No. 175608)
815 Fifth Street, Suite 200
Santa Rosa, California  95404
Telephone:  (707) 525-1212
Facsimile:  (707) 544-1388

ATTORNEYS FOR PLAINTIFF

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JO ANNE WHITMAN,<br><br>                    Plaintiff,<br><br>          vs.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA, and DOES 1 through 100, inclusive,<br><br>                    Defendants. | Case No. C 07-04127 WHA<br><br>**OPPOSITION OF PLAINTIFF TO MOTION FOR SUMMARY JUDGMENT BY UNUM LIFE INSURANCE COMPANY OF AMERICA**<br><br>Date:          May 1, 2008<br>Time:         8:00 a.m.<br>Courtroom:  9 |

# TABLE OF CONTENTS

Page

I. INTRODUCTION .................................................. 1

II. STATEMENT OF FACTS ............................................ 1

    A. The SCHOOL was Founded by and is Controlled by a Religious Order of the Roman Catholic Church ........................................ 1

        1. Teaching the Catholic Faith is Mandated by the SOCIETY .......... 2

        2. The SCHOOL is Required to Implement the SOCIETY's "Goals and Criteria" on Pain of Removal of the Board of Trustees and/or Termination of the SCHOOL's affiliation with the SOCIETY ........ 3

        3. Upon Dissolution of the SCHOOL, all of its Assets must be Given to the SOCIETY or Another Sacred Heart School ............ 4

    B. The SCHOOL Shares Common Religious Bonds and Convictions with the Catholic Church .................................................. 5

III. THE PROVISIONS OF ERISA DO NOT APPLY TO THE SCHOOL'S LTD PLAN .. 9

    A. Definition of a "Church Plan" ........................................ 9

    B. Interpretive Decisions .............................................. 9

    C. The SCHOOL is "Controlled" by a Church ............................ 13

    D. The SCHOOL is "Associated With" a Church .......................... 14

IV. NO ELECTION HAS BEEN MADE UNDER SECTION 410(d) OF TITLE 26 TO HAVE THE LTD PLAN GOVERNED BY ERISA ................. 15

V. CONCLUSION ...................................................... 17

# TABLE OF AUTHORITIES

**Statutes**                                                                                             **Page**

26 U.S.C. § 410(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

26 U.S.C. § 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

29 U.S.C. § 1002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 11

29 U.S.C. § 1003 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


**Code of Federal Regulations**                                                                           **Page**

26 C.F.R. § 1.410(d)-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

26 C.F.R. 1.414(e)-1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9


**Cases**                                                                                                 **Page**

*Catholic Charities of Maine, Inc. v. City of Portland,*
     304 F.Supp.2d 77 (Dist. Me. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Chronister v. Baptist Health*, 442 F.3d 648 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Lown v. Continental Casualty Co.*, 238 F.3d 543 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 11

*Torres v. Bella Vista Hospital, Inc.*, 523 F.Supp.2d 123 (Dist. Puerto Rico 2007) . . . . . . . . . . 16

*United States v. Ron Pair Enterprises, Inc.*,
     489 U.S. 235; 103 L. Ed.2d 290, 109 S. Ct. 1026 (1989) . . . . . . . . . . . . . . . . . . . . . . 10


**Department of Labor ERISA Opinion Letters**                                                             **Page**

No. 95-10A, 1995 ERISA LEXIS 12 (June 16, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

No. 94-04A, 1994 ERISA LEXIS 4 (February 17, 1994) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

No. 90-13A, 1990 ERISA LEXIS 14 (May 10, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

No. 90-12A, 1990 ERISA LEXIS 13 (May 10, 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

No. 85-14A, 1985 ERISA LEXIS 32 (March 26, 1995) . . . . . . . . . . . . . . . . . . . . . . . . . 10, 14

I.

# INTRODUCTION

Defendant moves for summary judgment on plaintiff's state law claims of breach of contract and breach of the implied covenant in good faith and fair dealing. Defendant argues that the state law causes of action are preempted by the Employee Retirement Income Security Act ("ERISA").

Defendant's motion fails because the long term disability benefit plan at issue in this case is a "church plan" to which the provisions of ERISA do not apply, and no election has been made under § 410(d) of Title 26 to have the plan governed by ERISA.

II.

# STATEMENT OF FACTS

Plaintiff Jo Anne Whitman ("WHITMAN") was employed by Schools of the Sacred Heart - San Francisco (the "SCHOOL") at the time she became disabled. The SCHOOL sponsored and administered a long term disability plan (the "LTD PLAN."). Defendant Unum Life Insurance Company of America ("UNUM") issued an insurance policy underwriting the LTD PLAN. Whether or not the LTD PLAN is subject to ERISA depends on whether the SCHOOL is controlled by or associated with a church or convention or association of churches.

**A.    The SCHOOL was Founded by and is Controlled by a Religious Order of the Roman Catholic Church**

The SCHOOL was founded by The Society of the Sacred Heart (the "SOCIETY.") (Devincenzi deposition transcript ["Devincenzi DT"], 9:22-10:14 and Exhibit 1, p. 1 attached thereto).[1] The SOCIETY, also known as the Religious of the Sacred Heart, is a religious order of the Roman Catholic Church. (Devincenzi DT 17:11-20; 18:3-5; 22:11-23:9). The SOCIETY was founded in the 1800's by St. Madeleine Sophie Barat, a French nun who has been sainted by

---

[1] The pertinent pages and cited exhibits to the deposition transcript of Juli Devincenzi are attached as Exhibit A to the Declaration of Michael S. Henderson filed in support.

the Roman Catholic Church. (*Id.*) All members of the SOCIETY are Roman Catholic nuns. (*Id.*)[2]

The SCHOOL is an independent Catholic school (not an Archdiocese school) that is part of the Network of Sacred Heart Schools, a network of private Catholic schools established and controlled by the SOCIETY. (Devincenzi DT 15:11-17; 17:1-20 and Exhibit 1, p. 1 attached thereto). In order for the SCHOOL to be a part of the Network of Sacred Heart Schools, it must receive its charter as a Sacred Heart School from the SOCIETY. (Devincenzi DT 17:1-7 and Exhibit 1, p. 1 attached thereto). The SCHOOL must go through an accreditation process every six years that is conducted by the SOCIETY. (Devincenzi DT 19:4-23 and Exhibit 1, p. 1 attached thereto). The purpose of this process is to ensure that the SCHOOL, as well as other network schools, are educating and living out the "Goals and Criteria" of the SOCIETY. (Devincenzi DT 20:1-11). This process is mandatory for the SCHOOL, and it must meet the accreditation standards in order to remain a Sacred Heart School. (Devincenzi DT 20:12-21:14). The "Goals and Criteria" are established by the SOCIETY, and the accreditation process is performed by the SOCIETY, through the "Sacred Heart Commission on Goals" ("SHCOG") which is organized and run by the SOCIETY. (Devincenzi DT 19:12-23). In short, the Network of Sacred Heart Schools are controlled by the SOCIETY. (Devincenzi DT 26:2-14).

The SCHOOL pays annual dues to the Network of the Sacred Heart Schools, and to the U.S. Province of the SOCIETY. (Devincenzi DT 24:6-10; 26:2-14; 29:21-30:15). The SCHOOL pays an accreditation fee to the SOCIETY every six years. (Devincenzi DT 29:21-30:15).

### 1.    Teaching the Catholic Faith is Mandated by the SOCIETY

Goal number one of the "Goals and Criteria" set forth by the SOCIETY states: "Schools of the Sacred Heart commit themselves to educate to a personal and active faith in God."

---

[2] The SOCIETY is headed by an individual referred to as the "Superior General." (Devincenzi DT 92:8-10). The Superior General sits at the head of a general counsel for the SOCIETY, which is headquartered in Rome. (Devincenzi DT 92:14-25). The SOCIETY is divided into provinces. (Devincenzi DT 92:3-7). The U.S. Province covers the United States of America. (*Id.*) Each province is headed by a "Superior." (Devincenzi DT 92:11-13).

(Devincenzi DT 67:1-17 and Exhibit 2, p. 13 attached thereto). This is defined further in a seven part statement which makes clear that the Schools of the Sacred Heart must commit themselves to educate their students in the *Catholic* faith. (Devincenzi DT 67:10-69:2). Accordingly, while the SCHOOL is open and respectful of other faith traditions, it is clearly a Catholic organization, it recognizes that the Catholic faith is the foundation of Sacred Heart education, and it promotes Catholic faith as the foundation of this education. (Devincenzi DT 73:24-75:12 and Exhibit 2, p. 18 attached thereto). The SCHOOL continues to reaffirm that it is "Roman Catholic in essence and identity" even while it acknowledges the religious diversity in the world. (Devincenzi DT 77:7-78:7 and Exhibit 2, p. 24 attached thereto).

The "Goals and Criteria" are mandatory for the SCHOOL. (Devincenzi DT 83:22-84:6; 85:2-88:13 and Exhibit 4, p. 4 attached thereto). The SOCIETY mandates the following foundational principles for the SCHOOL:

> "1. In the goals and criteria, The Society of the Sacred Heart defines the mission of the school as part of the Society's educational mission in the Catholic Church.
>
> 2. Each school is accountable to the Society through the Sacred Heart Commission on Goals for adherence to the goals and criteria.
>
> 3. Each school's Board of Trustees and administration establish and uphold policies that are consistent with the goals and criteria.
>
> 4. The school allocates its resources to support each goal and its criteria.
>
> 5. The school is in compliance with the professional standards as stated by accrediting agencies."

(Devincenzi DT 65:18-66:13 and Exhibit 2, p. 12 attached thereto).

**2. The SCHOOL is Required to Implement the SOCIETY's "Goals and Criteria" on Pain of Removal of the Board of Trustees and/or Termination of the SCHOOL's affiliation with the SOCIETY**

The Bylaws of the SCHOOL require the trustees and administration of the SCHOOL to implement the goals of Sacred Heart education as specified from time to time by the SOCIETY.

(Devincenzi DT 79:2-80:4 and Exhibit 3, p. 2, § 5.2 as attached thereto). The trustees of the SCHOOL are required to have the SCHOOL participate in and submit to the evaluation process of the SOCIETY for the purposes of reviewing conformance with the goals and criteria for Sacred Heart Schools established by the SOCIETY. (*Id.* at p. 3, § 5.3) In the event that it is determined by the SOCIETY that the SCHOOL has failed to fulfill its obligations with respect to the goals and criteria established by the SOCIETY, it has the right to require the resignation or removal of the members of the Board of Trustees of the SCHOOL. *(Id.* at p. 3, § 5.4) Alternatively, upon such failure, the SOCIETY may terminate the SCHOOL's affiliation with the SOCIETY and with the Network of Sacred Heart Schools. (*Id.*)[3]

### 3. Upon Dissolution of the SCHOOL, all of its Assets must be Given to the SOCIETY or Another Sacred Heart School

The SCHOOL was first incorporated in 1887 as the "Academies of the Sacred Heart." (Exhibit B to Henderson Decl.). A number of amendments to the articles have been made over the years (Exhibits C through G to Henderson Decl.). As currently composed, the Articles of Incorporation specifically state that the purpose of the corporation is the operation of the Schools of the Sacred Heart in San Francisco "consistent with the educational and spiritual objectives and goals and criteria of the Network of Schools of The Society of the Sacred Heart in the United States." (Exhibit G to Henderson Decl., Article II. C. ). The property of the corporation is irrevocably dedicated to charitable purposes, and in the event of liquidation or dissolution, the assets are to be distributed, after paying all liabilities and returning any conditional transfers or conveyances, by returning 40% to the SOCIETY and 60% to another Sacred Heart educational institution in the United States of America which is then operating in accordance with the goals and criteria of the Network of Schools of The Society of the Sacred Heart. (*Id.* at Article III. C and D.).

---

[3] At least three members of the Board of Trustees are appointed by the SOCIETY. (Devincenzi DT 82:2-14 and Exhibit 3 at p. 5, § 6.2.) However, the SOCIETY's real control comes through its establishment of "Goals and Criteria," its review of the SCHOOL's compliance with these standards, and its power to remove the Board of Trustees and/or terminate the SCHOOLS affiliation for failure to comply.

1 The SCHOOL bylaws state that in the event of the dissolution of the corporation as a result of termination of affiliation of the SCHOOL with the SOCIETY, the dissolution provisions of the Articles of Incorporation apply. (Devincenzi DT 79:2-80:4 and Exhibit 3, p. 3, § 5.5 attached thereto). Further, in the event of a termination of the affiliation of the SCHOOL with the SOCIETY which does not result in a dissolution of the corporation, the trustees may retain the assets in order to continue operating the SCHOOL, but on the condition that they contribute to the SOCIETY an amount equal to 40% of the fair market value of such assets, including the real property assets. (*Id.*) Articles 3, 4 and 5 of the bylaws cannot be amended without consent of the majority of the provincial team of The Society of the Sacred Heart - United States Province. (*Id.* at p. 20, Article 14.)

### B. The SCHOOL Shares Common Religious Bonds and Convictions with the Catholic Church

The mission statement for the SCHOOL identifies it as a "Catholic school" founded to "carry on the educational mission of The Religious of the Sacred Heart." (Devincenzi DT 112:2-17 and Exhibit 9, p. 1 attached thereto). The philosophy of the school is identified as "clearly Catholic," while striving to maintain a global and ecumenical perspective. (*Id.*)

A little over half of the faculty of the SCHOOL are Catholic. (Devincenzi DT 101:7-11; 104:2-9 and Exhibit 7, p. 1 attached thereto). Regardless of religious affiliation, however, each employee of the SCHOOL is required to support the "Goals and Criteria" of Sacred Heart Schools established by the SOCIETY which are set forth above. (Devincenzi DT 104:10-105:21; 107:21-108:7 and Exhibit 7, p. 2 attached thereto). This is a condition of their employment. (*Id.*)

The majority of students enrolled at the SCHOOL are Catholic (ranging between 51% to 55%). (Devincenzi DT 109:2-21 and Exhibit 8 attached thereto). The balance of the student body is made up of a smattering of other religious affiliations, with each comprising between 1% and 8% of the student body. (*Id.*) Approximately 18% of the student body is categorized simply as "no information." (*Id.*)

///

Regardless of religious affiliation, <u>all</u> students at the SCHOOL must attend all liturgy and prayer services. (Devincenzi DT 96:21-97:2). These religious services are clearly Catholic, including among others: Mass of the Holy Spirit; All Saints Liturgy; St. Philippine Duchesne; Feast of the Immaculate Conception; Ash Wednesday; Feast of St. Madeleine Sophie. (Devincenzi DT 97:3-24 and Exhibit 6, p. 15 attached thereto).

All students at the SCHOOL are taught Catholicism. (Devincenzi DT 113:7-9 ["We are guided by and faithful to the Roman Catholic tradition of faith in God and in Jesus Christ"]; Devincenzi DT 114:13-115:10 [Children are taught stories of "Catholic heroes and saints throughout history," and "are taught religion from the Catholic perspective"]; Devincenzi DT 115:19-116:4 [Students from kindergarten through 8th grade receive religious instruction that is "taught from the Roman Catholic perspective on faith"]). An examination of the Religious curriculum reinforces this fact:

**BOYS**

- 1st grade boys: the primary goal for students is to begin to understand "the traditions of the Catholic church." (Devincenzi DT 116:5-12).
- 2nd grade boys: students are taught the Sacraments of Reconciliation and the Eucharist or Holy Communion." (Devincenzi DT 116:13-119:1).
- 3rd grade boys: are taught to "acquire an understanding of why and how the Catholic church exists," and to "see the interconnections of the liturgical calendar and how it fits into the annual and seasonal calendar." (Devincenzi DT 119:2-120:6).
- 4th grade boys: are taught to "understand that the beatitudes and 10 Commandments form the basis for living an authentic Christian/faithful life. (Devincenzi DT 120:7-21).
- 5th grade boys: are taught to understand Sacraments in the life of the Catholic church. (Devincenzi DT 121:6-24).

/ / /

/ / /

1  • 7th grade boys: are taught to understand the dual nature of Jesus being both simultaneously human and divine, and are taught of the history of the Incarnation. (Devincenzi DT 122:9-123:3).

### GIRLS

- Kindergarten girls: are taught various feast days celebrated by the Religious of the Sacred Heart. (Devincenzi DT 126:17-127:8).
- 2nd grade girls: are taught the basic teachings about sacramental life of the Catholic church, the meaning and importance of the Sacrament of Reconciliation, the Eucharist/Holy Communion/Mass and its significance, and prayers common to the Catholic church. (Devincenzi DT 127:10-129:5).
- 3rd grade girls: are taught common prayers and Mass responses, the religious beliefs of the Catholic church, and Sacraments of Vocation (matrimony, holy orders and anointing of the sick). (Devincenzi DT 129:18-130:12 and Exhibit 10, pp. 6 and 7 attached thereto).
- 4th grade girls: are taught the purpose of the Eucharist/Mass and common prayers and precepts. (Devincenzi DT 130:13-24 and Exhibit 10, p. 6 attached thereto).
- 5th grade girls: are taught the sacramental nature of life, liturgical celebrations and communion of saints. (Devincenzi DT 130:25-131:5 and Exhibit 10, pp. 8 and 9 attached thereto).
- 6th grade girls: are taught various biblical stories and narratives using the "Catholic Youth Bible New Revised Standard Version." (Devincenzi DT 125:4-6; 131:6-12 and Exhibit 10, pp. 10 and 11 attached thereto).
- 7th grade girls: are taught about the early Church, the institution of Sacraments and a demonstration and understanding of the Seven Sacraments of the Catholic church today. (Devincenzi DT 131:17-132:16).
- 8th grade girls read "Primary Source Documents of the Catholic Church." (Devincenzi DT 132:17-25).

///

Non-Catholics are allowed to decline training for the Sacrament of Communion, but otherwise are required to go to all religious classes. (Devincenzi DT 52:8-18).

In addition, the SCHOOL provides information to the San Francisco Archdiocese of the Roman Catholic Church concerning statistics on race and religious affiliation of its students and faculty. (Devincenzi DT 28:5-25). The Archdiocese includes the SCHOOL and its listings in the National Catholic Directory. (Devincenzi DT 31:22-32:25). The SCHOOL has asked to be included in the directory because it is "a Catholic school." (*Id.*) The SCHOOL pays yearly dues to the Archdiocese. (Devincenzi DT 34:6-15). The Archdiocese oversees a yearly report to the National Catholic Education Association that is used for the listing in the National Catholic Directory. (Devincenzi DT 42:20-43:7 and Exhibit 1, p. 2 attached thereto). The SCHOOL holds a membership in the National Catholic Education Association and maintains its listing in the National Catholic Directory in order to maintain its status as a non-profit institution. (Devincenzi DT 44:21-45:3 and Exhibit 1, p. 2 attached thereto).

The SCHOOL has a chapel on site where masses are held. (Devincenzi DT 53:12-17). No other religious services besides mass are held at the SCHOOL. (Devincenzi DT 54:7-9). The SCHOOL holds family masses on Sundays five times a year and celebratory and convocational masses as well. (Devincenzi DT 54:22-55:1 and Exhibit 1, p. 2 attached thereto). A convocational mass is held at the beginning of each school year which is mandatory for all staff to attend, whether Catholic or not. (Devincenzi DT 56:5-57:11). All masses held at the SCHOOL during the school year are mandatory for all students, whether Catholic or not. (Devincenzi DT 57:14-58:5). The SCHOOL lists holy days and holy days of obligation on the school calendar, as well as advent and lenten dates. (Devincenzi DT 59:9-13 and Exhibit 1, p. 2 attached thereto). The SCHOOL observes Ash Wednesday services, All Saints Day observances, and other masses and religious observances related to Sacred Heart feast days. (Devincenzi DT 61:3-7 and Exhibit 1, p. 2 attached thereto). The SCHOOL also lists the Jewish holidays of Rosh Hashanah and Yom Kippur and Hanukkah on the school calendar, but does not celebrate these holidays. (Devincenzi DT 61:24-62:5). There are no non-Catholic religious services conducted at the SCHOOL. (Devincenzi DT 62:6-13).

## III.

## THE PROVISIONS OF ERISA DO NOT APPLY TO THE SCHOOL'S LTD PLAN

The provisions of ERISA do not apply to a church plan "with respect to which no election has been made under § 410(d) of Title 26." 29 U.S.C. § 1003(b)(2). The facts cited above clearly establish that the LTD PLAN is a "church plan." Whether an "election" under § 410(d) has been made is addressed in Section IV below.

### A.  Definition of a "Church Plan"

The term "church plan" means a plan established and maintained for its employees by "a church or by a convention or association of churches" which is exempt from tax under § 501 of the Internal Revenue Code of 1986. 29 U.S.C. § 1002(33)(A). A person is considered an "employee of a church or a convention or association of churches" for purposes of the statute if they are an employee of "an organization, whether a civil law corporation or otherwise, which is exempt from tax under § 501 of the Internal Revenue Code of 1986 [26 U.S.C. § 501] and which is <u>controlled by</u> *or* <u>associated with</u> a church or convention or association of churches." 29 U.S.C. § 1002(33)(C)(ii)(2) (Emphasis added). An organization is "<u>associated with a church</u> or convention or association of churches if it <u>shares common religious bonds and convictions</u> with that church or convention or association of churches." 29 U.S.C. § 1002(33)(iv) (Emphasis added).

The term "church" includes a "religious order or a religious organization if such order or organization (1) is an integral part of a church, and (2) is engaged in carrying out the functions of a church, whether as a civil law corporation or otherwise." 26 C.F.R. 1.414(e)-1(e). A plan which otherwise meets the definition of a "church plan" does not lose its status as a church plan because of the fact that "it is administered by a separately incorporated fiduciary such as a pension board or a bank." 26 C.F.R. 1.414(e)-1(f).

### B.  Interpretive Decisions

There is very little case law adjudicating the question of when a benefit plan is or is not a "church plan." This issue has not yet been addressed by any court within the Ninth Circuit.

///

All statutory interpretation begins with the language of the statute itself, and where the statute's language is plain, "the sole function of the courts is to enforce it according to its terms." *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241; 103 L. Ed.2d 290, 109 S. Ct. 1026 (1989).  Here, the statute plainly states that welfare benefit plans maintained by any organization, whether a civil law corporation or otherwise, are "church plans" if that organization is *either* controlled by *or* associated with a church or a convention or association of churches.  29 U.S.C. § 1002(33)(C)(ii)(2).  "Associated with" means nothing more and nothing less than sharing common religious bonds and convictions with the church. 29 U.S.C. § 1002(33)(iv).

The United States Department of Labor has issued opinion letters that set forth factors reviewed by the department to determine if an organization qualifies for "church plan" status. In these opinion letters, the department has reviewed factors both related to control and to association, considering whether:  A religious order or congregation controls the entity sponsoring the plan; the operation of the organization further the goals of the religious order; the entity and/or the religious order are listed in an official religious directory; the organization is a not-for-profit tax exempt entity pursuant to § 501 of the Internal Revenue Code; and members of the religious order sit on the Board of Directors of the organization. (See generally ERISA Opinion Letter No. 95-10A, 1995 ERISA LEXIS 12 (June 16, 1995) [church plan status given to health care system which is operated by a religious order of the Roman Catholic Church]; ERISA Opinion Letter No. 94-04A, 1994 ERISA LEXIS 4 (February 17, 1994) [church plan status given to a health care system controlled by a religious order of the Catholic church]; ERISA Opinion Letter No. 90-13A, 1990 ERISA LEXIS 14 (May 10, 1990) [church plan status given to college controlled by a religious order of the Catholic Church]; ERISA Opinion Letter No. 90-12A, 1990 ERISA LEXIS 13 (May 10, 1990) [church plan status given to nursing center controlled by a religious order of the Catholic Church]; ERISA Opinion Letter No. 85-14A, 1985 ERISA LEXIS 32 (March 26, 1995) [church plan status given to hospital controlled by a religious order of the Catholic Church]).

///

Defendant cites to two out-of-circuit cases, *Lown v. Continental Casualty Co.*, 238 F.3d 543 (4th Cir. 2001) and *Chronister v. Baptist Health*, 442 F.3d 648 (8th Cir. 2006), for the proposition that an employee benefit plan is only a "church plan" if the sponsoring organization discriminates against non-believers, something the SCHOOL clearly does not do. There are a number of problems with Defendant's argument.

First, *Lown* and *Chronister* only address when an organization is "associated with" a church, <u>not</u> whether the organization is "controlled by" a church. *Lown*, 238 F.3d at 548 [Convention of Baptist churches did not appoint or approve a majority of the board, and "Lown points to no other factors indicating that the Convention controlled the hospital," thus issue turned on whether hospital was "associated with" the Convention]; *Chronister*, 442 F.3d at 652 [hospital had severed its ties with the Convention of Baptist churches, and had not been directly controlled by the church since 1966, thus issue was whether the hospital was "associated with" the Baptist Convention]. Thus, even if the Court were to follow these out-of-circuit decisions, their holding would only pertain to whether or not the SCHOOL is "associated with" the Catholic church.

Second, *Lown* and *Chronister* fail to cite any authority for or provide any persuasive analysis of their conclusion that an organization should refuse to serve non-believers before it is found to be "associated with" a church. None of the Department of Labor opinions cited above include such a requirement. In *Lown*, the first to announce this test, the Fourth Circuit appears to have simply created it as a matter of first impression. *Lown*, 238 F.3d at 548. No explanation or rational is offered for this rule. (*Id*.) In *Chronister,* Eighth Circuit adopted the *Lown* holding without analysis or explanation, other than to state, "We find the Fourth Circuit's test useful and adopt it for analysis in the instant case." *Chronister*, 442 F.3d at 653. Whether "useful" or not, there is simply <u>nothing</u> which supports such a rule. The plain language of the statute only requires the sponsoring organization share *"common religious bonds and convictions"* with the church. 29 U.S.C. § 1002 (33)(C)(iv). Perhaps the *Lown* and *Chronister* courts thought such bonds and convictions would inevitably lead to the exclusion of non-believers. Yet, they cite no empirical evidence of this, nor any religious or public policy that would support such a view.

Indeed, many religions welcome non-believers into their churches and institutions (hospitals, schools, charities, etc.) in order to minister to them, proselytize to them, and hopefully convert them. The Department of Labor, as cited above, has routinely found employee benefit plans maintained by hospitals, schools and skilled nursing centers to be "church plans" without ever requiring evidence that these institutions refused to serve non-believers. In each instance, the Department of Labor looked merely for factors that assured the organization adhered to the tenants and teachings of the church.

The case of *Catholic Charities of Maine, Inc. v. City of Portland*, 304 F.Supp.2d 77 (Dist. Me. 2004) is instructive. In determining whether a health benefit plan of Catholic Charities of Maine, Inc., was a "church plan" exempt from federal regulations under ERISA, the court separately examined whether Catholic Charities of Maine was "controlled by" the Catholic church and whether it was "associated with" the church. Noting that ERISA does not define "controlled by," the court held that most courts have interpreted the provision as referring to corporate control, such as control over the appointment of a majority of the non-church organization's officers or Board of Directors. (*Id.* at 85) Applying this test, the court concluded that there were facts which certainly suggested that Catholic Charities was "controlled by" the Catholic Church, including the fact that certain key positions were either held by the Diocesan Bishop of Portland and a Vicar General, or appointed by them. <u>However, the court concluded it did not need to decide the question of control because Catholic Charities was indisputably "associated with" the church</u>. (*Id.* at 85)

The court correctly identified the test for "associated with" a church as being whether the organization "shares common religious bonds and convictions with that church." (*Id.* at 85) While noting that there was <u>nothing in the record to suggest that Catholic Charities imposed a denominational requirement on its employees, or those who received its services</u>, the court held that Catholic Charities was nonetheless "associated with" the Roman Catholic Church because its stated mission was to provide services "based on Roman Catholic religious teaching that calls on Catholics to serve those in need," and considered its work "a vital part of the ministry of the Roman Catholic Church to the people of the State of Maine." (*Id.* at 85) Further, Catholic

Charities' mission statement declared that it was "an organization of the Diocese of Portland that implements the social teaching of Jesus Christ as taught by the Catholic Church." (*Id.*) The Diocese of Portland provided financial assistance to the Catholic Charities on an annual basis, and Catholic Charities was listed in the official Catholic directory "Anno Domini," an annual Catholic directory. *(Id.)* The court held:

> "These undisputed facts show that Catholic Charities shares common religious bonds and convictions with the Roman Catholic Church and is, therefore, 'associated with' the church."

*(Id.* at 85) The court found support in its holding from the Department of Labor opinion letters 96-19A, 95-30A, and 95-12A which all assessed "bonds and convictions" by looking at factors that assured the organization adhered to the tenants and teachings of the church, including whether the organization was listed in a religious directory and whether the church played a role in the organization's governance. (*Id.* at 85-86)

### C. The SCHOOL is "Controlled" by a Church

Here, the SCHOOL is clearly controlled by the SOCIETY, a religious order of the Catholic Church, specifically founded to promote Catholic education. The SCHOOL was founded by the SOCIETY, receives its charter from the SOCIETY, belongs to a network of schools controlled by the SOCIETY, and must comply with the "Goals and Criteria" established by the SOCIETY. The SCHOOL must go through an accreditation process every six years, conducted by the SOCIETY, to ensure compliance. The bylaws of the SCHOOL require the trustees and administration of the SCHOOL to implement the goals of Sacred Heart education as specified from time to time by the SOCIETY. At least three members of the Board of Trustees of the SCHOOL are appointed by the SOCIETY. While this by itself gives limited control, the SOCIETY maintains absolute control through its establishment of "Goals and Criteria," its review of the SCHOOL's compliance with these standards, and its power to remove the Board of Trustees and/or terminate the SCHOOLS affiliation for failure to comply. In short, the SOCIETY controls the SCHOOL, whose very existence and operation serve the "Society's educational mission in the Catholic Church."

///

The Department of Labor opinion letters clearly equate control by a religious order of a church is synonymous with control by a "church" for purposes of certifying a "church plan." (ERISA Opinion Letter No. 95-10A, 1995 ERISA LEXIS 12 (June 16, 1995) [church plan status given to health care system which is operated by a religious order of the Roman Catholic Church]; ERISA Opinion Letter No. 94-04A, 1994 ERISA LEXIS 4 (February 17, 1994) [church plan status given to a health care system controlled by a religious order of the Catholic church]; ERISA Opinion Letter No. 90-13A, 1990 ERISA LEXIS 14 (May 10, 1990) [church plan status given to college controlled by a religious order of the Catholic Church]; ERISA Opinion Letter No. 90-12A, 1990 ERISA LEXIS 13 (May 10, 1990) [church plan status given to nursing center controlled by a religious order of the Catholic Church]; ERISA Opinion Letter No. 85-14A, 1985 ERISA LEXIS 32 (March 26, 1995) [church plan status given to hospital controlled by a religious order of the Catholic Church]).

### D. The SCHOOL is "Associated With" a Church

The SCHOOL indisputably shares "common religious bonds and convictions" with the Roman Catholic Church. The SCHOOL is required to commit, and does commit, itself to educate its students in the *Catholic* faith. The SCHOOL openly declares that while open to and respectful of those of other faith traditions, the SCHOOL is clearly a Catholic organization, that the Catholic faith is the foundation of its education, and that it promotes the Catholic faith. In short, the SCHOOL is "Roman Catholic in essence and identity."

While the SCHOOL does not discriminate against non-believers, the majority of its faculty and students are Catholic. More importantly, all faculty and students, regardless of religious affiliation, are required to support the "Goals and Criteria" established by the SOCIETY, which specifically include the promotion, teaching and observance of the Catholic faith. Regardless of religious affiliation, all students at the SCHOOL must attend all liturgy/mass and prayer services. Only Catholic religious services are conducted at the SCHOOL. All students at the SCHOOL are taught Catholicism. The SCHOOL openly states that it is "guided by and faithful to the Roman Catholic tradition of faith in God and in Jesus

/ / /

Christ," and students from kindergarten through 8th grade receive religious instruction that is "taught from the Roman Catholic perspective on faith"

In addition, the SCHOOL provides information to the San Francisco Archdiocese of the Roman Catholic Church, which includes the SCHOOL in its listings in the National Catholic Directory. The SCHOOL does this because it considers itself "a Catholic school." The SCHOOL pays yearly dues to the Archdiocese, which oversees a yearly report to the National Catholic Education Association that includes the SCHOOL. The SCHOOL is a member of the National Catholic Education Association, a fact which allows it to maintain its status as a non-profit institution.

There is simply no question that the SCHOOL shares "common religious bonds and convictions" with the Roman Catholic Church. The SCHOOL is indistinguishable from the hospitals, colleges, and healthcare systems found by the Department of Labor Opinions, cited above, to be "associated with" the Roman Catholic Church. The undisputed facts presented here provide similar assurance that the SCHOOL adheres to the tenants and teachings of the church.

### IV.

### NO ELECTION HAS BEEN MADE UNDER SECTION 410(d) OF TITLE 26 TO HAVE THE LTD PLAN GOVERNED BY ERISA

Defendant argues that various indications exist that the SCHOOL, its agents, and Defendant all thought the LTD PLAN was governed by ERISA. Defendants cite certain language in the plan description which refers to ERISA, the fact that annual Form 5500's were filed, and that the SCHOOL's Human Resource Director is under the belief that the plan is an ERISA plan. None of these facts are relevant to whether the LTD PLAN is, in fact, a "church plan," nor are these facts sufficient to convert what is otherwise a "church plan" into an ERISA plan.

The law prescribes a very narrow and precise method that must be followed in order to elect to have a church plan governed by ERISA. Such an election must be made "in such form and manner as the secretary may by regulations prescribe." 26 U.S.C. § 410(d). The regulations setting forth the procedure for making such an election are found at 26 C.F.R. § 1.410(d)-1(c).

1 | The election must be made by the plan administrator of the church plan, who must attach a
2 | statement to either the annual return required under § 6058(a) or a written request for a
3 | determination letter relating to the qualification of the plan. (*Id*.) The statement "shall indicate
4 | (I) that the election is made under § 410(d) of the Code [26 U.S.C. § 410(d)] and (ii) the first
5 | plan year for which it is effective." 26 C.F.R. 1.410(d)-1(c)(5).

6 | Defendant has failed to produce such a statement. None of the other documents cited–the plan description or the Form 5500's–meet the plain requirement of the statute and regulation. The case of *Torres v. Bella Vista Hospital, Inc.*, 523 F.Supp.2d 123 (Dist. Puerto Rico 2007) [modified on other grounds] is instructive. There, the evidence showed that defendant hospital filed a Form 5500 along with its federal tax return, and attached a notation to it which stated that "the plan is subject to the provisions of the Employee Retirement Income Security Act of 1974 (ERISA)." *Torres*, 523 F.Supp.2d at 138. Further, the plan documents contained several statements declaring that the plan was subject to ERISA. (*Id*. at 141) The court held that neither of these actions by the hospital amounted to a §410(d) election "because the Hospital never explicitly states that it is making the election under that specific section, as required by the regulations. (*Id*. at 141) The court acknowledged that there was very little case law on this issue, but that it was clear that the Code of Federal Regulations "imposes a strict requirement that the electing party state explicitly that it is making its election under §410(d)." (*Id*. at 141 fn. 3)

19 | The SCHOOL did not make an election that complies with §410(d). The SCHOOL's intentions are ambiguous at best, and may simply reflect a mistaken belief that the LTD PLAN was required to comply with ERISA, rather than an intention to affirmatively elect to have ERISA govern. In any event, the SCHOOL's failure to submit a written statement under §410(d) electing to have the LTD PLAN governed by ERISA is fatal to Defendant's argument.

24 | / / /
25 | / / /
26 | / / /
27 | / / /
28 | / / /

OPPOSITION OF PLAINTIFF TO MSJ BY UNUM
LIFE INSURANCE COMPANY OF AMERICA

V.

**CONCLUSION**

Applying the plain language of the statute, and the Department of Labor interpretations, it is clear that the LTD PLAN at issue is a "church plan." No election has been made under § 410(d) of Title 26 to have the LTD PLAN governed by ERISA. Therefore, the LTD PLAN is exempt from ERISA.

DATED: April 10, 2008                TEAL & MONTGOMERY


By: _____/S/_____
MICHAEL S. HENDERSON
Attorney for Plaintiff